24-13307 Shannon Waller, Jr. v. Board of Regents of the University System of Georgia Ms. Taylor Good morning, Your Honors, and may it please the Court, my name is Lisa Taylor and I am Appellate Counsel for Mr. Shannon Waller. This Court should reverse the District Court's pre-discovery Rule 12 dismissal of Mr. Waller's claims against the Board of Regents of the University System of Georgia for two reasons. First, the Board of Regents waived any claim of sovereign immunity under the Georgia Constitution as to Mr. Waller's breach of contract claim because Middle Georgia State University entered into a written contract with Mr. Waller through his admission letter, the respiratory therapy program handbook, or both. Second, Mr. Waller's complaint plausibly alleges that his exclusion from the respiratory therapy program was because of his disabilities under the ADA and Rehabilitation Act and the District Court's dismissal of that improperly applied a heightened pleading standard contrary to the Supreme Court's well-established pleading standards under Iqbal and Twombly. On the second point, Ms. Taylor, can you tell me what allegations in the complaint you think say that the University discriminated against Mr. Waller based on his disability? Yes, Your Honor, absolutely. Because the gist of the complaint is that rightly or wrongly, they thought he had done some things wrong in his program and disciplined him for that. And you've got all sorts of breach of contract claims about that, about them not following certain procedures. But where are the allegations, do you think, that they took action against him because of his disability or on the basis of his disability? Yes, Your Honor, I'll be glad to walk through the specific paragraphs with this prefatory statement first. It's important to bear in mind with regard to this question about whether the allegations in the complaint are sufficient to meet the plausibility pleading standard of Iqbal and Twombly that, first off, all that needs to be alleged is enough factual content to support a reasonable inference that the defendant may be liable for the conduct alleged. And the type of issue that we're dealing with when it comes to causation in this context, which is the same causation issue under other federal anti-discrimination laws as well, the very nature of that issue is that it's very often something that is in the mind of the defendant, the actor who took the action on behalf of the defendant. There's almost never, very rarely, going to be direct evidence that can be pointed to to identify what that evidence, what that causation, how that causation can be established. So it's inferential and circumstantial to begin with. And here, the complaint contains more than enough allegations to support that type of inference, which is all that Twombly and Iqbal require. Paragraphs 31 through 33 and 35 through 39 of the complaint allege that from early in Mr. Waller's time as an MGSU student, instructors and leaders in the department referenced their knowledge of his disabilities, which are ADD, anxiety, and depression, and their negative impressions stemming from those disabilities. Things like that they knew of them, that he had a nervous anxiety, and that they commented about them to one another and to other instructors. Further, those same paragraphs allege that the university demanded psychiatric documentation, that he was not a danger and could handle stress, with which he complied. Paragraphs 47 through 51 allege that the Houston Medical Center employees, where he was trying to complete the very last step of his two-year degree program, with an internship program at the end of his degree, of his education, that those employees also knew that they perceived him as unsatisfactory as a result of his disabilities, and that they communicated their perceptions and opinions of his ADD, anxiety, and depression to each other and to the defendants at the university. I agree with you that the complaint alleges knowledge, at least by some employees, of his disability and that they had concerns about it. But what he was found liable for was essentially endangering patients. What in the complaint ties those concerns to that charge? Well, Your Honor, I don't know that I could point to a specific allegation that connects those. But all that needs to be alleged at this point is that the ultimate dismissal from the program is causally connected to the disability. And it's an inference of discriminatory intent. And it's not uncommon that in many employment discrimination cases, for example, the employer may have articulated some other reason that the decision was made. The fact that that allegation is present in the complaint is not enough then to defeat the possibility of an inference. What happens then is that in the trial court and during discovery, the plaintiff then needs to gather evidence to present in opposition to a likely motion for summary judgment as to why that proffered reason, which here is along the lines of the facts that Your Honor just mentioned, that that proffered reason was not the true reason, that it was false, or that some other motive was behind it. Is there any allegation in the complaint that the people who were involved in the disciplinary process who imposed the sanction knew about his disability or had concerns about it? There are no specific allegations that the people who were on the disciplinary hearing panel had knowledge, but that the complainants who launched the process that led to the disciplinary hearing panel that put the matter before them to begin with certainly knew. There's ample allegations of their knowledge and of their biases influencing their decisions along the way. You say their biases. What specifically about biases? Your Honor, the allegations in the complaint are that they perceived him as having nervous anxiety. You point to perception, but you said bias. I want to know specifically about bias. Okay. Yes, Your Honor. I think that the bias is directly related to the perception. It stems from the perception that because of these displays of behavior that stem from the disabilities, that we don't like the way this person interacts. But is that articulated in the complaint? I understand you're making the argument now, but when you say a perception, people perceive lots of things, but now you're making the argument that that perception was a biased perception, it was biased against him because of his disability. I'm wondering where in the complaint you articulate that. Yes, Your Honor. I think it's the same paragraphs that I mentioned earlier, 31 through 33, 35 through 39, that talk about the perceptions, the biases of the USG employees who were behind the whole process that led to Mr. Waller being presented for a disciplinary hearing. And that paragraphs 52 through 54 tie all that together, that these negative impressions were false and unsupported by evidence. And before I move briefly, unless the court has other questions on this, to the contract claim, I would also just say that if the allegations in this complaint were not enough to support what Twombly and Iqbal require for an inference of discriminatory intent, causation between the adverse action and the protected category, then a question, I guess the state or the court, if it were to determine that that's the case, as to what would be enough. This court's decision in Jones versus Georgia Department of Community Health addressed allegations that were far thinner. Essentially, all the plaintiff alleged in that case was an assertion that the circumstances surrounding the plaintiff's termination raise a reasonable inference that it was motivated by her disability. That was it, and this court found that that was enough with essentially no analysis, reversed the district court's dismissal and remanded it. That was a 2022 decision from this court. So if that was enough, then this complaint goes much further. Let me ask you a question about the contract before you sit down. The only writing signed by both parties is the acceptance letter. And the acceptance letter said the parties agree basically to the contents of the letter. What in the letter makes any promise about his ability to continue in the program or to graduate despite disciplinary infractions? Your Honor, the letter references the additional materials that Mr. Waller would have to accept and agree to in order to continue on in the program. But ultimately, your question goes to the merits of what are the terms of the contract. And under the Georgia Supreme Court's most recent decision addressing the scope of the scovered immunity waiver, and I see that I'm out of time. May I continue? In the justice decision, the Georgia Supreme Court made very clear that those types of questions that go to what are the terms of the contract are to be decided on the merits. The only question at the threshold facial attack on the complaint stage like we have here is whether the allegations, whether a written contract was formed. It's contract formation that matters, not what the terms of that contract were. Well, but there also have to be the necessary terms have to be contained within the signed document, right? The necessary terms, so in other words, to the extent that Mr. Waller's breach of contract claim is that the university failed to comply with its own processes and code of conduct standards. Those terms would need to be part of the contract, but whether those terms are part of the contract or not is a merits question. The only question at this stage is whether a contract was formed, and in this case it was because the letter is an offer. He accepted it. There's consideration, and there's assent by both parties and a subject matter on which it can operate, which is all the Georgia Code requires. But a contract requires that the agreement have certain definite terms, right? Yes, Your Honor, although the Georgia, the case law on the question of contract formation for sovereign immunity purposes refers just to OCGA 1331, which is parties to the contract, their assent, consideration, and a subject matter on which it can operate. But assume a different scenario in which a university or college in Georgia, part of the region system, sends an acceptance letter that says, congratulations, you've been accepted to the university. Sign here, and we'll be in touch about orientation. Is there a contract? No attachment, no nothing, just a letter. Congratulations, you've been accepted. Sign here. Nothing else. Is there a contract? Probably not in that situation, if that's literally all that's in the letter. This letter is different. So this letter incorporates some documents, including the student handbook, right? Yes, and it also... So everything, is it your claim that everything in the student handbook is a part of the contract between Mr. Waller and the university? I think that is what Mr. Waller can prove as part of the merits of his contract claim on remand. But the letter itself contains significantly more terms of commitment than the hypothetical letter that you've described that simply says, you're in, come to orientation. This one says, your signature on this acceptance letter will serve as your acceptance of the contents of the attached documents. Sign below as your commitment to begin in the fall of 2020. He had to sign it and return it. That's very different than the hypothetical letter. Okay, that means you're going to get a, you're admitted as a student, you're going to get an education here. But your contract claim depends necessarily, I think, on the student handbook being incorporated into the acceptance letter, does it not? Ultimately, Mr. Waller... I mean, the breaches that you allege in the complaint are all based on the student handbook or the operational guidebook, right? The program handbook. Yes, Your Honor, that's right. And ultimately, Mr. Waller, we'll need to prove that those are part of the contract. But that's exactly what the Georgia Supreme Court, that's the precise issue the Georgia Supreme Court addressed in the justice case. And in that case, the court very clearly held that it's only the contract formation that matters at the outset. In that case, the terms that the plaintiff was seeking to enforce, commitments about rights under the FLSA in that situation, were not on the face of the letter either. Right, but there were some definite terms like salary and position, right? Yes, Your Honor, I think the same is true for the letter here. There's no less commitment reflected in the admission letter in this situation. Okay, we'll give you your full time for rebuttal. Thank you very much, Ms. Taylor. Thank you, Your Honor. Mr. Kang. Good morning. May it please the Court, my name is Jason Kang and I represent the Board of Regents. Mr. Waller bears the burden to show that the contract sought to be enforced is in writing, contains all the necessary terms to constitute a valid contract, and is signed by both parties. He fails to meet his burden on each ground. The signature requirement has sort of been called into question by a couple of Georgia Supreme Court decisions, right? Not overruled, but called into question? It has, and I believe Your Honor is referring to the Federal Defender case. There are two of them. There are two Georgia Supreme Court cases in which the Court says, you know, we have this signing requirement, but we don't know where we got it from. We imported it from a statute of frauds case. It may not be applicable, but we don't need to decide that issue. Sure, the signature requirement is still applicable here, and even if we were to assume that the acceptance letter was signed, that would not be determinative of the outcome here, because there is not a contract that does not, neither of the documents that Mr. Waller points to contains the necessary terms of the contract. So, to be clear, Mr. Waller is stating that the policies and procedures of the university are the contract sought to be enforced. If we go to the June 8, 2020 acceptance letter, the acceptance letter is nothing more than a placeholder tentatively holding open a spot for Mr. Waller to enroll in the fall of 2020. There's no material term written in the letter stating that the Board of Regents intends to incorporate the handbook or any policies and procedures into a contract. But it tells him that his signature is an assent to the content of the attachment, and the attachment is a student handbook, right? It's not clear from the face of the acceptance letter of what documents it is referring to. It just says that there is a document attached, and you're agreeing by signing this letter that you agree to what's stated in the document, but there's no language. And the complaint doesn't elaborate on that, on what documents were attached to the letter? No, Your Honor. The complaint simply states that Mr. Waller assented by signing two documents, Exhibit A and Exhibit B, which are the acceptance letter and the verification of the respiratory therapy program handbook. Mr. Waller has also attached those two documents to his complaint. However, there's no specific attachment to the offer letter or the acceptance letter that would indicate what those documents are. But even if we were to assume that it was the respiratory therapy program handbook, there is no contract. There's no necessary terms binding the parties to uphold the student handbook as a contract. But here on page 7 of the complaint, paragraph 27, he says as part of the same transaction, on August 16, 2020, he signed the Middle Georgia State University Respiratory Therapy Program Verification of Receipt or of Handbook. You don't think that ties into the acceptance letter? You think that's a different date and time and document? It is, Your Honor. So paragraph 27 specifically is referring to the verification of the receipt of the handbook. That's the second document. That's not the acceptance letter. And in terms of the district court's decision, it found that these documents are signed in different times, different places, for different reasons. These are over two months apart. The district court cited a couple of cases stating that even nine weeks or three months suggested that these documents were not contemporaneous. If we turn to Mr. Waller's argument that the handbook by itself constitutes a written contract sufficient to waive sovereign immunity, Mr. Waller concedes that the handbook is not signed by the Board of Regents. And his main argument on that point is that the party's course of conduct would make the handbook sufficient to waive sovereign immunity. But the law requires a written document with express terms. An implied contract cannot waive sovereign immunity. So Mr. Waller fails on that point. In terms of the acceptance letter— You think that that principle holds no matter what the student handbook says? If a student handbook says, you know, by agreeing to admission and accepting our offer to be admitted, you and the university hereby agree to abide by all the terms set forth in the student handbook. If that were the case, you think that there's still no written contract? So in that case, there still needs to be a signature on behalf of both parties, and there has to be express language. So if the language that you're suggesting, Your Honor, would be express language on behalf of the Board of Regents to enter into a binding contract, then it's perceivably yes. However, that language is not present here in either document. If we go to the acceptance letter, again, this has to do with enrolling in the fall of 2020, which Mr. Waller did. His spot was held open. He began the program in August of 2020. There's no alleged breach based on that, and it has nothing to do with the alleged contract that is sought to be enforced here regarding disciplinary policies and procedures and whether they constitute a contract. Well, his claim on the breach of contract side is that the university failed to follow certain procedures that it was required to follow pursuant to both the student handbook and the respiratory program handbook. Right? I'm not asking you to agree with the claim, but that is the claim, right? Yes. And those terms are not involved in any of the writings that Mr. Waller is alleging. There's no agreement between the parties that the Board of Regents intends for the student handbook to be a contract or for it to be a binding contract. Of course, these are the university's policies and procedures that the student is required to follow when they enroll, and the university does follow these policies and procedures because there was a due process claim below, which was dismissed, and the policies and procedures were followed by the university in providing a hearing. So, Mr. Waller was provided with the process that he was due. And on appeal, Mr. Waller has abandoned that claim. There really is no argument or viable argument that the university didn't follow its own policies and procedures. But the question here related to sovereign immunity is whether or not there is a written contract signed by both parties that contains all the necessary terms to constitute a valid contract, and those terms are not present here. If I may turn just briefly to—unless Your Honors have further questions about the breach of contract claim— No, you can move on to the other one. Thank you. Related to the ADA and the Rehabilitation Act claim, Mr. Waller does not plead that he received a failing grade by reason of his disability. He was found responsible for actions and behaviors that endanger patient safety, which is very different from a disability. So, specifically, he was found responsible for making changes to ventilators without notifying a therapist, placing a patient on BiPAP not under supervision, and performing an ABG backwards despite being given previous guidance and feedback on the correct manner in which to perform this test. And so, as a respiratory therapy student, Mr. Waller is treating critically ill patients at a hospital, and he's required to treat those patients under supervision. These concerns do not come from any of the individual appellees, but from physicians and hospital staff who told Ms. Miller that Mr. Waller could not come back to the clinical externship site. Ms. Miller is not the one who made that decision. The hospital performed its own independent investigation into the behavior of Mr. Waller and decided he could not come back. Mr. Waller also attached a couple of documents as well as an audio recording of the hearing. I mean, is that the first thing you mentioned, that the hospital conducted its own investigation? Is that in the complaint? It's in the recording of the audio recording of the hearing that is attached to the complaint. Okay. And that recording makes no mention of any disability whatsoever. So Ms. Miller and Ms. Brown are simply relaying the information that they've received from hospital staff about Mr. Waller's dangerous and inappropriate behavior at the clinical site. The hearing panel who made the decision, they based it on strictly that information, that they did not hear anything about a disability. And the rationale, which is also attached to the complaint of the hearing panel, they find him responsible because Mr. Waller also admitted that he performed the procedures at least one time on the dates in question. And then he further explained this during his testimony. If anything, Mr. Waller pleads that he blew the whistle on April 21st, 2022, regarding the clinical site's failure to use the appropriately sized cannula on a patient. And then that eight days later, he was revoked. Again, that has nothing to do with a disability. It doesn't have anything to do with any of the appellees. It's more of a claim that he may have been retaliated against by the clinical site. But that has nothing to do with the appellees here, and it has nothing to do with a disability. And to my colleague's points about paragraphs 33 to 35 and the other paragraphs that she pointed to, there's no specific, there's no specificity as to what these complaints or opinions were against Mr. Waller or why they led to his removal. And so unspecified complaints by unspecified persons in some unspecified way led to his removal from House and Health Care, not by the Board of Regents, and then somehow led to his removal from the university. And that's taken the district court's language as well that this is more of a shock and pleading where it does not provide to any specific defendant on notice of what he or she is alleged to have done. That concludes my argument, unless the court has any other questions. But we would respectfully request that you affirm. Thank you very much. All right. Just a few points, Your Honors. First, on the contract claim with regard to the offer letter. Again, under Erie, the Georgia Supreme Court's decisions are controlling here. The very recent decision in justice is directly relevant authority. And if you were to go compare the letter in this case to the one there, there's at least as much, if not more so, terms of commitment in the letter that Middle Georgia sent to Mr. Waller as there was in the letter that the department sent to Mr. Justice in that case. But going beyond that, understanding that the terms of the handbook policies are important to the claim, as we discussed earlier, those can be incorporated into, and it's a merits determination as to whether they form part of that contract. But also the handbook combined with the verification form formed a separate contract. How do we know what was incorporated into the acceptance letter? The acceptance letter is silent on what the document is, and Mr. Kang says that the complaint doesn't identify what that document was either. I believe that is correct, Your Honor. But what the complaint does do is allege sort of a series of events whereby the offer letter was signed and returned. It contemplated attending required orientation and that as part of the required orientation, the handbook documents were provided and the verification had to be signed and returned. The verification also contains terms of commitment whereby Mr. Waller in signing had to state that he read and understood the material and will adhere to the policies. And the policies themselves have terms of commitment in them, establishing detailed processes and procedures for disciplinary processes, dismissal, conduct standards, and explicitly incorporate the student code of conduct. And notably, Your Honors, this handbook is very similar in many ways to handbooks that have been found by multiple Georgia courts to be contracts between students and private universities. There are cases that are cited on page 27 of our opening brief involving Clark Atlanta University, Morehouse College, Emory University, Mercer University, Life Chiropractic, and others where contracts have been found to exist in the student handbooks and codes of conduct from those schools. And justice instructs that the law is no different. There is no separate set of rules for what it takes to establish a written contract between a state entity and an individual than there is between a private entity and an individual. It's the same standards. Turning then back to the... Just to understand your position, the contract here, and if I've mischaracterized your argument, let me know. Your position is that the contract between Mr. Waller and the university consisted of the acceptance letter, the program handbook, and the student handbook all taken together? Or is it one or the other, or just a couple of those, or just one of those? Your Honor, all we need for purposes of sovereign immunity is one written contract. I know, but I'm asking you what you think that written contract consists of. I... Forget the terms, just what are the documents that make up the contract, whatever the content is. Yeah, I think that there are at least two contracts that can either stand alone or be combined. One is the admission offer letter.  And two is the respiratory therapy program handbook with the signed verification that was part of it. These are in the district court docket at Docs 37-3 and 37-4. Okay, but not the student handbook that's incorporated in the program handbook? Well, again, I think that's kind of going to go to the merits of the contract claim on remand if Mr. Waller gets that far, that whether the incorporation of the student code of conduct into the respiratory therapy program handbook makes that a term of that contract or not. Okay. Okay. All right. Thank you very much. All right. And so in closing, Your Honor, we just ask that this court reverse and remand. Thank you. Thank you both. All right.